**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| **TOYA R. CRAIN, D.H.A.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.: 1:19-cv-3967-RLY-DML** |
| ) | |
| **ROBERT WILKIE,** ) | |
| **SECRETARY of the UNITED STATES** ) | |
| **DEPARTMENT of** ) | |
| **VETERANS AFFAIRS,** ) | |
| ) | |
| **Defendant.** ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Toya R. Crain, D.H.A. (hereinafter "Dr. Crain" or "Plaintiff"), for her response

to Defendant's, Robert Wilkie, Secretary of the United States Department of Veterans Affairs

(hereinafter "Defendant"), motion for summary judgment, pursuant to S.D. Ind. L.R. 56-1, files

her memorandum of law and statement of material facts in dispute, and states that Defendant's

motion must be denied, as there are genuine issues of material fact precluding such motion, and

Defendant is not otherwise entitled to a judgment in its favor as a matter of law.

    **I.**      **STATEMENT OF MATERIAL FACTS IN DISPUTE**

    **A.**      **PLAINTIFF WAS SUBJECTED TO A SEXUALLY**
                **HOSTILE WORK ENVIRONMENT AND MANAGEMENT**
                **DID NOTHING ABOUT IT**

In December of 2014 Plaintiff was inappropriately touched by a subordinate probationary

Environmental Management Service ("EMS") employee under Plaintiff's supervision when the

employee touched the side of her face as he tried to whisper in her ear. (Ex. A, Crain Deposition I, page 58; Ex. B, Toya R. Crain, Deposition II, page 9)[1]   Plaintiff informed the subordinate probationary employee "don't ever do that again." (Ex. B, Crain Dep. II, p. 10) Shortly after, on December 19, 2014, this same employee came into Plaintiff's office, obviously inebriated, and shoved his cell phone into Plaintiff's face, indicating he had tried to call his EMS supervisors to tell them he would be late to work. (Ex. B, Crain Dep. II, p. 12) Plaintiff's secretary, Delisa Cunningham, witnessed this and described it as "scary." (Ex. C, EEOC Transcript, Cunningham testimony, pp. 262-263) Ms. Cunningham also wrote a "Report of Contact" regarding the incident. (Ex. B, Crain Dep. II, p, 14, ex. 56)

Dr. Crain gave this employee a written counseling regarding this event in her office. (Ex. B, Crain Dep. II p. 17, ex. 57) In spite of Dr. Crain's efforts to correct this probationary employee's conduct toward her, there was another incident on or about February 25, 2015, when Plaintiff came out of the women's restroom late in the afternoon and found the employee waiting there for her. (Ex. B, Crain Dep. II, p. 20, ex. 58) The employee asked her what she thought of him personally, and Dr. Crain indicated she had no personal thoughts about him and that he needed to talk to his supervisor if he had any issues.  (Id.)  Since it had been about three months since HR and executive management were informed about this employee's earlier inappropriate actions toward her, Dr. Crain indicated to Human Resources (HR) that something had better be done about the employee or she would be consulting EEO. (Id.)

In response to Plaintiff's reports, which were corroborated by her secretary, all

---

[1] Hereinafter "Ex. A, Crain Dep. I, p. _".  Crain Dep. I, was taken 07/11/2019, under her previous complaint in 1:18-cv-03689-RLY-DML. Ex. B, Crain Dep. II, was taken 09/04/2020 after her above-captioned Consolidated Complaint was filed.

2

management did about this harassing subordinate probationary employee's inappropriate behavior was to tell Plaintiff to "call the police or HR" is she felt her safety was in danger. (Ex. B, Crain Dep. II, p. 25) Plaintiff was also told to park her car in front of the police station, to get an escort to walk her to and from her car, and if she needed to walk in the hospital near where this employee was working, that she should take someone with her. (Ex. B, Crain Dep. II, pp. 27-28) Dr. Crain had been at the Richard L. Roudebush VA Medical Center (RLR VAMC) long enough to have seen management take quick action to terminate other employees almost on the spot for harassment allegations like she was bringing forth, and had never heard of other harassed employees like her being instructed, as she had been, to lock their office doors, or park near the police station, or take any of the extraordinary measures Plaintiff was being asked to take. (Ex. A, Crain Dep. I, p. 50)

Because nothing was being done about her hostile working environment complaints regarding this subordinate employee, Dr. Crain initiated an EEO informal charge of discrimination against the Agency.  (Ex. D, EEOC Investigative File, p. 00075 - 00078).[2]  The Agency was notified about her EEO charges on March 11, 2015. (Id.)  And shortly after that, Plaintiff was informed that it had been determined that her complaints about the subordinate harassing employee were not credible, when Cathy Lee-Sellers, the Assistant Medical Director and Dr. Crain's direct report, ended her "investigation" on March 30, 2015. (Ex. D, EEOC IF pp. 00326-00339)

Dr. Crain next contacted the Agency's regional, or VISN, HR Department, to complain about the lack of action and support for her from the RLR VAMC executive management. (Ex.

[2] Hereinafter "EEOC IF, p. _"

3

B, Crain Dep. II, pp. 29-31) The VISN HR contact, Claudia Blakely, emailed Dr. Crain back,

indicating she had talked with Cathy Lee-Sellers about the situation. (Ex. B, Crain Dep. II, p. 34)

Plaintiff then had a meeting with her boss, Cathy Lee-Sellers, who was mad, and said to Dr.

Crain: "You went over my head."  (Ex. B, Crain Dep. II, p. 35)

**B. AS THE ONLY BLACK FEMALE NON-MEDICAL SERVICE CHIEF, PLAINTIFF WAS NOT ADVANCED TO A GS-13 PAY LEVEL OR HIGHER AS WERE WHITE SERVICE CHIEFS**

As Chief of Service of the EMS, Dr. Crain was one of fourteen non-medical chiefs of

service at the RLR VAMC. (Ex. D, IF pp. 00263-00264) Plaintiff's pay level was lower than all

male service chiefs at the RLR VAMC. (Id.) The only other non-medical chief of service also

paid a GS-12 pay, the Chief of Voluntary Service, made $8,000,00 more than did Plainitff. (Id.)

And Plaintiff was the only Black non-medical service chief. (Id.)

The position of Chief of EMS is titled "Hospital Housekeeping Officer." (Ex. E, Scaife

Dep. at 37, ex. 2) The position used to be classified as a GS-13, but it was downgraded on a

national level to a GS-12 level by a decision 07/25/2011 by the VA's Office of Human Resources

Management (OHRM). (Id.) Plaintiff was an intern at the RLR VAMC in 2013 when she

participated in in-person and telephone interviews of three candidates to fill the EMS Chief

position as a GS-13 position. (Ex. B, Crain Dep. II, pp. 47-49) The position did not get filled via

these interviews and for a while it was occupied by internal RLR VAMC employees. (Ex. B,

Crain Dep. II, p. 53)

Plaintiff was finishing her internship program in early 2014 and Medical Director

Thomas Mattice asked her if she would be interested in taking over EMS, as Acting Chief of

Service. (Ex. B, Crain Dep. II, pp. 53-55) Plaintiff was informed that if she completed her probationary period, the RLR VAMC would do whatever it took to make the position a GS-13. (Id.)  Eva Anderson in HR was working on the Position Description (PD) and informed Plaintiff the position would be a GS-13, just like it used to be. (Ex. B, Crain Dep. II, pp. 55-56) Plaintiff was already a GS-12 level and the promise of a GS-13 made the offer worthwhile. (Ex. B, Crain Dep. II, p. 56)

RLR VAMC's position classifier Elaine Scaife was asked to review and classify the position with the intent to make it a GS-13. (Ex. E, Scaife Dep. pp. 42-43) She reviewed the position description she received and her analysis was it still only rated a GS-12. (Ex. E, Scaife Dep. pp. 43-46, ex. 3)  The position description and organizational chart did not contain laundry or linen services, which may have tipped the balance to a GS-13 rating had those services been added to the EMS service. (Ex, E, Scaife Dep. pp. 48-51) The organizational chart given to Scaife had been approved by the Medical Director, Thomas Mattice, to approve the position as a GS-13. (Ex. E, Scaife Dep. pp. 51-53) In classifying positions at the RLR VAMC, the Human Resources Officer (HRO) and the top executive officer at the facility, the Medical Director, both have the authority, and could have overruled Scaife's rating, and made the position at GS-13 in spite of her rating.  (Ex. E, Scaife Dep. pp. 23, 53)

Plaintiff's performance plan, given to her by Assistant Medical Director Cathy Lee-Sellers after Scaife's rating, dated 10/15/14, indicates Plaintiff's Chief of EMS position is a GS-13. (Ex. E, Scaife Dep. pp. 54-55, ex. 4) Plaintiff's performance evaluation by Ms. Lee-Sellers, dated 12/17/14, also after Scaife's rating, states Plaintiff's Chief EMS position is a GS-13. (Ex. E, Scaife Dep. pp. 54-56, ex. 5)

5

During this same period, Caucasian service chiefs were being elevated to GS-13 and GS-14 positions: white male Sean Strauss, Chief of Logistics Service, was elevated first to a GS-13 then a GS-14, improperly. (Ex. E, Scaife Dep. p. 57)  Classifier Scaife had been asked to rate Strauss' position at a GS-14, but refused to go along. (Id.) The HRO at RLR VAMC also refused to rate the Logistics service chief a GS-14; so Medical Director Mattice did so himself. (Id.) White male Chief of Police, Brian Fogg, was rated either a GS-13 or a GS-14, even though there was a national appeal decision that had rated the position as a GS-12. (Ex. E, Scaife Dep. p. 58)

A whole new service not existing at any other VA facility in the United States was created for white male Richard Griffith: the service was titled SCOPE, and the RLR VAMC added various engineering positions and other such duties to the service in order to make it rate to a GS-14 level. (Ex. E, Scaife Dep. pp. 59-61) Also white female Jennifer DeFrancesco's position as Chief of BioMed Service was rated at either a GS-13 or GS-14 level. (Ex, E, Scaife Dep. pp. 61-62.) Scaife's boss, Assistant HRO Gavin Earp, also increased the pay levels of three white females during this period to GS-13 levels. (Ex. E, Scaife Dep. p. 64)   In addition, there was also Jennifer Wickware, white female, Chief of Food and Nutrition Services, increased from GS-13 to GS-14 level, and Penny Butler, while female, Chief of Systems Redesign, increased from a GS-13 to a GS-14 level. (Ex. B, Crain Dep. II, p. 58, ex. 60)

The pay levels of these white male and female service chiefs while Plaintiff's position remained a GS-12 level caused her to add to her formal EEO charges a disparate pay claim. (Ex. D, IF p. 00079)

      **C.**      **PLAINTIFF CREATED A CULTURE OF INCLUSION AND ACCOUNTABILITY, IMPROVED THE EFFICIENCY OF WORK PERFORMED,  AND SAVED THE AGENCY**

## MILLIONS OF DOLLARS AS CHIEF OF SERVICE

SEIU Local 551 union president Nicole Golder testified that when Plaintiff became the Chief of EMS there was a "dramatic" decrease in issues from that department. (Ex. C, EEOC Transcript p. 309) Employees even came to the union and said how "great" Plaintiff was as their chief. (Id.)  Plaintiff's logistics specialist David Walker, testified that prior to Plaintiff's tenure as Chief of EMS, there was a "perceived lack of institutional control" over EMS employees and "not a lot of accountability." (Ex. C, EEOC Transcript, David Walker testimony, p. 293) Dr. Crain, Mr. Walker testified, put things in place to actually make supervisors do their jobs. (Id.)

One of Plaintiff's supervisors, Reginald Williams, testified that Plaintiff made EMS "more of a family-like atmosphere" where "everyone was held accountable" and "there was a structure built in a short amount of time" so "everyone was starting to know exactly what was expected of them." (Ex. C, EEOC Transcript, Williams testimony, p. 466) Mr. Williams testified there was "warm feeling throughout the department" which was "something that was long overdue." (Id.)  EMS supervisor Robert Franklin testified that Plaintiff "made us a valuable member of the hospital team" and it gave him "a sense of pride to work for EMS." ( Ex.C, EEOC Transcript, Franklin testimony, p. 510)

Shannon Claybrook was Plaintiff's EMS secretary and then assisted as the EMS Quality Assurance person with gathering testing data to implement a change in cleaning chemicals at the hospital. (Ex. F, Claybrook Dep. pp. 13-14, 18) He stated that Plaintiff's leadership made positive "cultural changes" in the department. (Ex. F, Claybrook Dep. p. 24) Plaintiff instituted Six Sigma continuous improvement techniques and let people know "what they were doing and when" they were doing it. (Ex. F, Claybrook Dep. p. 25) Plaintiff held formal "huddles" where

employees' ideas were heard. (Id.) Plaintiff dressed up in scrubs and actually worked alongside EMS employees to get a better handle on what the issues were. (Id.)

Chief for Mental Health Patient Care Services Jennifer Sims testified that Plaintiff would come to nurse manager staff meetings and take questions and offer input, which was something no other chief of service did. (Ex. G, Sims Dep. p. 24) Ms. Sims' opinion was that Dr. Crain "took the challenge on well and handled it well" of being Chief of EMS. (Ex. G, Sims Dep. pp. 22-23)

As Chief of EMS, Plaintiff sought out advice from other VA facilities regarding EMS and learned that there were better cleaning chemicals being used to clean some hospitals. (Ex. A, Crain Dep. I, pp. 85-86) In his role in Quality Assurance, Shannon Claybrook helped perform a lot of ATP testing where the old and the new cleaning chemicals were tested and side by side comparisons were made. (Ex. F, Claybrook Dep. pp. 18-20) The new chemicals did a better job and were safer to use because they did not have to be mixed like the old chemical which caused splash burns for employees. (Id.) The safety department and infection control were brought in on the change. (Id.)  No one complained except the housekeepers (who did not like change). (Ex. F, Claybrook Dep. pp. 21-22)

Plaintiff's plan to change cleaning chemicals was approved by the entire hospital. (Ex. A, Crain Dep. I, pp. 87-88) There were many presentations and months of discussions with doctors and nurses and there was committee approval from infection control. (Id.; Ex .C, EEOC Transcript, Robert Franklin testimony, pp. 494-495) The result was a higher rate of cleaning and less infection in the hospital and the same chemical is still used today. (Ex. C, EEOC Transcript, Robert Franklin testimony, pp. 495-496; Ex. F, Claybrook Dep. pp. 22-23) The change in

8

cleaning chemicals was not something done unilaterally by Plaintiff without having everyone necessary on board to make the change. (Ex. C, EEOC Transcript, Cunningham testimony, pp. 264-265)

David Walker was Plaintiff's logistics specialist when she was Chief of EMS and he testified that in deciding whether to change cleaning chemicals manufacturers were brought into the hospital, and besides himself, he was in meetings with Logistics, Nursing and Infection Control. (Ex. C, EEOC Transcript, David Walker testimony, pp. 294-295) Mr. Walker did a cost analysis and there was a cost savings and there was very much improved infection control with the new chemical. (Id.)  EMS supervisor Reginald Williams testified that the change to the new cleaning chemical lowered the time it took to clean rooms. (Ex. C, EEOC Transcript, Williams testimony, pp. 467-468)

An annual inspection of the hospital called the Joint Commission that took place when Plaintiff was Chief of EMS resulted in a finding of no deficiencies with EMS for the first time ever. (Ex. B, Crain Dep. II, p. 43; Ex. C, EEOC Transcript, Reginald Williams testimony, p. 468; Ex. C, EEOC Transcript, Robert Franklin testimony, pp. 498-499) The accreditations that come from a successful Joint Commission inspection keep the hospital from being shut down. (Ex. B, Crain Dep. II, p. 42)

Ryan Kuster is a program analyst with the RLR VAMC who helped Dr. Crain study the issues, put together the data, and then suggest a big change at the hospital, which was adopted, in terminated the cleaning contract the facility had with Goodwill Industries that saved the facility over a million dollars a year.  (Ex. H, Kuster Dep. pp. 20-24, ex. 1; Ex. F, Claybrook Dep. p. 27) Getting rid of the Goodwill Industries workers also allowed more Veterans to be hired at the

RLR VAMC which is one of the foundational goals of the EMS. (Ex.F, Claybrook Dep. p. 27)

### D. PLAINTIFF CONDUCTED HERSELF PROFESSIONALLY IN HER SPEECH AND IN HER ACTIONS AS CHIEF OF EMS AT THE RICHARD L. ROUDEBUSH VAMC

Cathy Lee-Sellers issued a "written counseling" to everybody working in EMS on November 21, 2014 alleging use of "profanity and/or abusive language." (Ex. A, Crain Dep. I, ex. 22) The memorandum cites no specific person, no specific language, and does not indicate any context of any alleged profane or abusive language. (Id.)  Plaintiff disputes that she engaged in any speech that would qualify or fall under any such written counseling. (Ex. A, Crain Dep. I, pp. 78-84) In fact, everyone in EMS received the same memorandum with nothing but their individual names changed on each memorandum. (Id.)  Plaintiff specifically informed Ms. Lee-Sellers that she disagreed with the memorandum. (Id.)  In response, Ms. Lee-Sellers told Plaintiff that she decided to give it to everyone instead of just "one or two people." (Id.)  And Plaintiff has no idea what "harassment or intimidation or retaliation" is being alleged in the memorandum. (Id.)  EMS supervisor Robert Franklin testified that he received the exact memorandum as Plaintiff with the only change being his name instead of Plaintiff's name. (Ex. C, EEOC Transcript, Franklin testimony, p. 490) In fact, Mr. Franklin testified that Plaintiff's language as Chief of EMS was "professional" and he never heard her belittle anyone. (Ex. C, EEOC Transcript, Franklin testimony, p. 487)

Union president Nicole Golder testified that Dr. Crain was "not known to use profane or abusive language" toward employees and that Dr. Crain was "very polished and professional" in dealings with her. (Ex. C, EEOC Transcript, Golder testimony, p. 309) David Walker testified that he left Logistics after 15 years to work for Dr. Crain in EMS because he "saw the way she

10

operated her department .. liked it .. and wanted to go and learn" under her. (Ex. C, EEOC

Transcript, David Walker testimony, p. 298) Not surprisingly, after Dr. Crain was removed from

Chief of EMS in 2015 and was detailed to Fiscal, her co-worker there, Julynn Walker, testified

that Plaintiff "never used profane language during professional activities like meetings or in the

office." (Ex. C, EEOC Transcript, Julynn Walker testimony, pp. 327-328)

Dr. Crain was charged in her removal memorandum of using profane language in a

telephone call with Business Manager Tara Casey discussing Camp Atterbury: Plaintiff expressly

denies that allegation. (Ex. A, Crain Dep. I, pp. 84-85) Likewise, Plaintiff expressly denies any

disruptive behavior a week after the phone call with Casey, also as alleged in her removal

memorandum, in discussing Camp Atterbury issues with Ambulatory Care. (Ex. A, Crain Dep. I,

p. 85) And the only other claim of profanity in her removal memorandum, if one could call it

that, is the use of the word "ass" in a mediation session. ((Ex. A, Crain Dep. I, ex. 21)

The signer of Plaintiff's removal memorandum, the Acting Medical Director at the time

Brian Hancock, is a person known to drop the F-bomb in meetings, as testified to by Andy

Brown, Plaintiff's current direct supervisor, who has worked at the RLR VAMC since 1993. (Ex.

I, Brown Dep. p. 20) Mr. Brown has heard former Chief of Staff Dr. Munshi drop the F-bomb in

meetings a couple of times and Chief of Anesthesiology use profanity in small meetings. (Ex. I,

Brown Dep. pp. 21, 24) Profanity is used by upper management and Mr. Brown has heard Clyde

Angel, who issued Plaintiff her removal from Chief of EMS notice, use profanity a lot in

meetings. (Ex. I, Brown Dep. pp. 19, 22)

The Chief for Mental Health Patient Care Services Jennifer Sims testified that "people

use profanity" all the time at work. (Ex. G, Sims Dep. p. 28) And Ms. Sims does not know

anyone ever disciplined for such use of profanity. (Ex. G, Sims Dep. p. 29) Ms. Sims also

testified that former Police Chief Brian Fogg would cuss at patients and drop the F-bomb on

them when called to deal with them on an emergency policing situation at the hospital. (Ex. G,

Sims Dep. pp. 26-27) Supervisory program analyst Amber Taylor testified that she hears

profanity in meetings, including the F-bomb, but does not think anyone ever got in trouble for

doing so. (Ex. J, Taylor Dep. pp. 26-27) Supervisory budget analyst Patricia Caruthers testified it

was not uncommon for people to use profanity in their business work, even service chiefs, and

she does not know of anyone ever getting in trouble for the same. (Ex. K, Caruthers Dep. pp. 21-

22)

### E.      DR. CRAIN DID NOT FAIL TO TAKE THE LEAD, NOR DID SHE MISMANAGE, NOR DID SHE ABANDON HER RESPONSIBILITY TO OVERSEE THE NEW UNIFORM DISTRIBUTION

Plaintiff's Quality Assurance program assistant Shannon Claybrook testified that is was

"unfair" to criticize Plaintiff for what was a "surprising" number of issues involved in changing

and issuing new uniforms for the hospital. (Ex. F, Claybrook Dep. pp. 27-28) Mr. Claybrook

testified that it was Dr. Crain's idea to have new and standardized, more professional, uniforms

in the hospital. (Id.)  He stated it was a "logistical issue with the union" and that the union would

"stop" the ordering of uniforms in part because Dr. Crain insisted that employees tuck their shirts

in. (Id.) David Walker, Dr. Crain's logistics specialist, testified that he had no idea why EMS

became responsible for this uniform program, but in any event, Dr. Crain worked daily on the

issue and in no way shirked her responsibilities in the matter. (Ex. C, EEOC Transcript, David

Walker testimony, pp. 295-297)

Plaintiff's secretary Cunningham testified that the main criticism about the new uniforms from the nurses were that they were not fitting.  (Ex. C, EEOC Transcript, Cunningham testimony, p. 265) EMS supervisor Williams testified that the uniforms came back in as fast as they went out because of the nurses complaints of the fit. (Ex. C, EEOC Transcript, Williams testimony, pp. 469-470)  Everyone ended up getting new uniforms but Dr. Crain got no credit for it. (Id.)   EMS supervisor Franklin testified that Dr. Crain did not drop the ball with the uniforms, and that the only thing he saw that she did "improper" was to actually work herself passing out uniforms. (Ex. C, EEOC Transcript, Franklin testimony, pp. 496-498)

> **F.    DR. CRAIN DID NOT ENGAGE IN PRE-SELECTION OF ROBERT FRANKLIN AS HER ASSISTANT CHIEF AND WAS NOT ALLOWED ANY INPUT INTO SELECTING HER ASSISTANT CHIEF**

Dr. Crain worked with Deb Thayer and together they put together questions for interviewees for filling the position of her Assistant Chief when another lady left that position. (Ex. B, Crain Dep. II, p. 77, ex. 64) Plaintiff asked Ms. Thayer to be the interview panel chair because her Acting Assistant Chief, Robert Franklin, was one of the interviewees and Dr. Crain did not want to appear to be unfair about the selection. (Ex. B, Crain Dep. II, pp. 77, 87) After the first round of interviews, Dr. Crain looked at the scoring of candidates, and thought the ratings were inconsistent, do to a lack of comments on some of the scoring sheets. (Ex. B, Crain Dep. II p. 80)  She met with then Acting Assistant Director Clyde Angel, who was taking over that position for Cathy Lee-Sellers who was temporarily absent from the RLR VAMC, and discussed that she and Deb Thayer had found inconsistencies in the first round scoring and that maybe the top 5 or so candidates go onto round two of interviews. (Ex. B, Crain Dep. II, p. 81)

The next thing Plaintiff knows, on May 19, 2015, she gets an email from Mr. Angel telling her she is out of the process and he will take over for her, and make the selection to fill the position. (Ex. B, Crain Dep. II p. 83, ex. 67)

Mr. Angel testified that when he filled positions under his own Chief of Service position, he not only has input, he sits on the interview panel and interviews candidates. (Ex. C, EEOC Transcript, Angel testimony, p. 550) Fiscal Chief of Services Joshua Meyers testified that when filling the Assistant Chief position under himself, he conducts all of the interviews by himself and makes the selection. (Ex. L, pp. 72-74) No one has ever suggested to him that there is any problem with his methodology. (Id.)

The next day Plaintiff amended her EEO charge to add this taking away from her having any input into the selection of her own assistant chief as a retaliatory action by the Agency. (Id.) When asked at his deposition whether a chief of service should have any input into the selection of his own assistant chief, Chief of Fiscal Services, Joshua Meyers testified: "I should hope so." (Ex. L, Meyers Dep. p. 74) Mr. Franklin had been placed as Acting Assistant Chief of EMS by Dr. Crain because he was the only person among all her EMS supervisors that took her up on her offer to do the position temporarily to see what it consisted of. (Ex. B, Crain Dep. II p. 74) Mr. Franklin testified that Dr. Crain never gave him any inside hints at what the interview questions for the Assistant Chief interviews were going to be. (Ex. C, EEOC Transcripts, Franklin testimony, p. 494)

**G.   DR. CRAIN RECEIVED OUT-OF-CHAIN-OF-COMMAND
       WORK INSTRUCTIONS FROM A BUSINESS  MANAGER
       REGARDING CAMP ATTERBURY**

On April 15, 2015, Plaintiff, on behalf of EMS, and Dr. Christopher Sueltzer, Chief of

Ambulatory Care Services, signed a memorandum of understanding (MOU) regarding a new position at a new location at Camp Atterbury, for a medical facility for Veterans' care there. (Ex. B, Crain Dep. II, p. 98, ex. 68) The position was to consist of two (2) employees furnished by Ambulatory Care and trained by EMS for the facility. (Id.)  On May 28, 2015, Dr. Crain received an email from Ambulatory Care's Business Manager Tara Casey telling Dr. Crain that Dr. Crain would now be in charge of manning the facility and asking her to get changes made to the position description for these two positions. (Ex. B, Crain Dep. II, pp. 99-100, ex. 69) This out-of-chain-of-command order from an inferior VA employee, Business Manager Tara Casey, was upsetting to Dr. Crain, not just because it was an out-of-chain-of-command order (which it was), and from an inferior hospital manager, but because it was against the MOU she had signed with Ambulatory Care Chief Sueltzer a month previously; and no information had come to Dr. Crain from her boss, Cathy Lee-Sellers, regarding any change in plans. (Ex. B, Crain Dep. II, pp. 100-101)

### H.   AFTER DR. CRAIN WAS REMOVED AS CHIEF OF EMS, SHE HAS CONTINUED TO EXPERIENCE A SERIES OF RETALIATORY ACTIONS AGAINST HER BY THE AGENCY

### 1.   The Agency Miscalculated Dr. Crain's Probationary Period

The regulations for calculating a chief of service's one-year probationary period states that time as acting chief of service is credited to the probationary time in the permanent position if there is no break in service between the two periods. (Ex. A, Crain Dep. I, p. 234: see also 5 C.F.R. § 315.906(b) and (e)).  The Agency miscalculated Dr. Crain's one-year probationary period for her service as Chief of EMS. (Ex. B, Crain Dep. II. p. 61) Dr. Crain even asked HRO

Chari Weddle and HR Specialist Eva Anderson about this issue, and was told her acting chief

time counted towards her one-year probationary period, because she had been acting chief for

several months. (Ex. B, Crain Dep. II p. 62)

>     **2.      Plaintiff Was Detailed Into Fiscal, A Service For Which She
>              Had No Educational Background Or Any Work Experience**

Dr. Crain's educational background is a Bachelor's of Science in Psychology Degree, and

Master's Degree in Social Work, and a Doctorate of Health Administration Specializing in

Health Care Leadership. (Ex. A, Crain Dep. I, p. 8, ex. 1) She had no prior work experience that

would relate to her detail to Fiscal Services.  (Ex. A, Crain Dep. I, p. 198) She did not posses the

financial skill set for everything they were assigning to her in her detail assignment to Fiscal

Services. (Id.)

>     **3.      When Plaintiff Started Working In Fiscal Services She Had No
>              Position Description Or Standards By Which To Know What
>              The Expectations Of Her Job Were**

When Dr. Crain was detailed to Fiscal Services, she had no position description or

standards by which to know what the expectations of her job entailed. (Ex. A, Crain Dep. I, p.

133)  Her supervisor Joshua Meyers told her he had been instructed not to provide her with a

position description or standards for her work in Fiscal.  (Ex. M, Plaintiff's Response to

Defendant's Third Set of Interrogatories, No. 14) Plaintiff went online to try to find a DSS

Clinical Coordinator position description, but all she could find was completely different from

the duties she was being assigned.  (Ex. A, Crain Dep. I, pp. 149-154, ex. 31) All the federal

employees testifying about this issue have stated how important a position description and

standards are for one's job in order to know what is expected of an employee and to know how

an employee is going to be evaluated in an annual performance review. (Andy Brown: Ex. I, p.

30; Patricia Caruthers: Ex. K, p. 24; Ryan Kuster: Ex. H, p. 28; Shannon Claybrook: Ex. F, p. 32;

Joshua Meyers: Ex. L, p. 29).

    **4.**    **While She Was Assigned To Fiscal Services, Plaintiff Was**
               **Never Included In The Service's Organizational Chart**

The position Dr. Crain  was sent to in Fiscal when she was removed as Chief of EMS was

not included in the Fiscal Service organizational chart, and when Fiscal's organization chart was

revamped later, her position as DSS Coordinator was also not in the chart. (Ex. A, Crain Dep. I,

pp. 135, 157).  Her co-worker's position,  Julynn Walker, was also not included in the new

organizational chart in May of 2016. (Ex. C, EEOC Transcript, Julynn Walker testimony, pp.

319-321) EEOC Hearing Exhibit C-32, A and B show the two charts, and the absence of

Plaintiff's position in both charts, and Ms. Walker's position also in the new chart. (Ex. C,

EEOC Transcript, Julynn Walker testimony, pp. 321-323, ex. C-32) Plaintiff had been in Fiscal

about a year at the time of the new organizational chart, but her position had never been included

in any of the organization's charts. (Ex. A, Crain Dep. I p. 168)  The federal employees who were

asked about the absence of their position in the organizational chart where they were working

indicated it would be concerning to them. (Andy Brown: Ex. I, pp. 31-32; Ryan Kuster: Ex. H, p.

28; Shannon Claybrook: Ex. F, p. 32)

    **5.**    **When Plaintiff Went On Vacation In The Fall Of 2016, Her**
               **Personal Belongings, Including Medical Records, Were**
               **Ransacked And Boxed Up, And Her Coffee Maker Was**
               **Broken Upon Her Return**

On November 1. 2016 Dr. Crain returned from a vacation and all of her things were

locked up or missing from her desk/work area, and her coffee maker was broken. (Ex. A, Crain

Dep. I, p. 183) Dr. Crain thought "now I am finally going to get fired." (Ex. A, Crain Dep. I, p.

192)

**6.     In June of 2017 Plaintiff Was Denied An Interview For The**
**Position Of Assistant Chief of Fiscal Services**

In May or June of 2017 Dr. Crain applied for the position of Assistant Chief of Fiscal

Services.  (Ex. A, Crain Dep. I, p. 212) She was denied even an interview, allegedly for "lack of

an accounting degree." (Ex. A, Crain Dep. I, p. 219) Plaintiff  thought that her two (2) years of

working in Fiscal Services as well as her Doctorate Degree in Health Administration should have

at least gotten her in interview. (Id.)

**7.     In July Of 2017 Plaintiff Applied For The Position Of Chief Of**
**Patient Care Services And Cathy Lee-Sellers Was On The**
**Interview Panel**

Dr. Crain applied for the position of Chief of Patient Center Care Services and was

interviewed on or about July of 2017 . (Ex. A, Crain Dep. I, p. 227-229) When she saw the panel

included Cathy Lee-Sellers, she knew she did not have a chance at the job. (Id.)  In fact, all three

panelists rated her lower that the other applicants. (Id.)  Of note, Plaintiff believes that incorrectly

putting in her work history, which is reviewed, that she did not successfully complete a previous

chief of service probationary period, is probably fatal to her chances of being rated better in any

interview. (Ex. A, Crain Dep. I, pp. 233-234)

**8.     Executive Management Has Spread The False Rumor That Dr.**
**Crain Was Removed As Chief Of EMS For Sleeping With**
**Suborindate Employees**

In the Summer of 2019, Plaintiff was in supervisory program analyst Amber Taylor's

office when a young African American intern who was in a program similar to the internship

program Dr. Crain had been in, entered Ms. Taylor's office. (Ex. B, Crain Dep. II, p. 113) The three of them were talking about the internship program they had all three been through when somehow Dr. Crain's removal from Chief of EMS came up. (Ex. B, Crain Dep. II, p. 114) The young intern stated: "that's not how I heard it." (Id.)  Plaintiff asked him "what did you say?" (Id.)  And the intern said "I heard you got fired for sleeping with subordinates." (Id.)  The intern stated he heard that rumor in executive meetings he had been in. (Id.)  Dr. Crain simply walked out of the office. (Id.)

Ms. Taylor's recollection of the statement was that the intern had been in some kind of meeting, not sure who was there, and someone said Dr. Crain had been removed as chief for having some kind of an inappropriate relationship.  (Ex. J, Taylor Dep. pp. 18-19)  Andy Brown, Dr. Crain's present direct supervisor at the RLR VAMC, testified that he heard it said in a staff meeting on a Wednesday, that Dr. Crain had been removed from EMS for having an inappropriate relationship with an employee in her service. (Ex. I, Brown Dep. pp. 15-17) The statement was made by either Jennifer Sims or Dr. Eric Boss. (Id.)  The statement was heard approximately in June of 2020. (Id.)  Patricia Caruthers, Fiscal Services budget analyst, testified that she had heard the rumor Dr. Crain was removed from EMS for having an inappropriate sexual relationship with a subordinate employee. (Ex. K, Caruthers Dep. p. 22-23) She heard it from her staff probably in 2016. (Id.)

The only RLR VAMC employee Plaintiff has had any kind of relationship with is Clarence Bellamy, who works in Safety Service, when they lived together for some time. (Ex. B, Crain Dep. II p. 126) Jennifer Sims testified that she heard a rumor that Plaintiff had "slept with someone" but agrees there would be nothing improper about Plaintiff and Mr. Bellamy having a

relationship. (Ex. G, Sims Dep. pp. 14, 34-35)

## II.     EXPERT EVIDENCE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In opposition to Defendant's motion, Plaintiff submits the report and curriculum vitae of her expert psychologist Nicole T. Buchanan, Ph.D. (Ex. N) Dr. Buchanan was tasked with assuming the facts as alleged in Plaintiff's Consolidated Complaint and after interviewing Dr. Crain, rendering her expert opinion on whether Dr. Crain has experienced race, gender, or retaliatory discrimination in the events described in Plaintiff's Consolidated Complaint. (Id.)  Dr. Buchanan's opinion is that Plaintiff has experienced race discrimination, gender discrimination, and illegal retaliatory discrimination for exercising her right to complaint about employment discrimination. (Id.)

## III.     LEGAL ARGUMENT

### A.     Summary Judgment Standard

The party moving for summary judgment has the evidentiary burden of informing the court of the basis for its motion. *Celotex Corporation v. Catrett*, 477 U.S. 317, 323 (1986) Once a moving party has done so, the nonmoving party must go beyond the pleadings and "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" 477 U.S. at 324 In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) The Defendant's motion is not supported by the uncontroverted facts and it not supported by the legal precedents.  Accordingly, its motion must be denied.

**B.** **THE EEOC DECISION SHOULD BE STRIKEN AS UNFAIRLY PREJUDICIAL TO PLAINTIFF AND AS AN IMPROPER ATTEMPT TO DEPRIVE HER OF HER DAY IN COURT**

This court has routinely rejected attempts to interject the EEOC's determination findings in matters to be tried *de novo* to a court or jury. *See Spreckelmeyer v. Ind. State Police Dep't*, 2017 U.S. Dist. LEXIS 3794 (S.D. Ind. 2017) (J., Pratt); *Gonzalez v. Ford Motor Co.*, 2014 U.S. Dist. LEXIS 168617 (S.D. Ct. 2014) (J., Pratt); *Martinez v. Clarian Health Partners, Inc.*, 2014 U.S. Dist. LEXIS 16168 (S.D. Ind. 2014) (J., Pratt); and *Hughes v. Indianapolis Radio License Co.*, 2009 U.S. Dist. LEXIS 6957 (S.D. Ind. 2009) (J., Lawrence).

In these Southern District Court decisions, the case of *Tulloss v. Near North Montessoori Sch., Inc.*, 776 F.2d 150 (7th Cir. 1985) is cited for keeping EEOC determinations out of the record as unfairly prejudicial in a F.R.E. 403 analysis. ALJ Maple's decision at the EEOC in this case is no less unfairly prejudicial to Plaintiff. What possible use could be made of the ALJ's EEOC decision but to send a message that this case has already been decided? While it may not be any problem in this summary judgment analysis for the court to disregard the EEOC decision, there is no good reason it should be part of the record of this federal lawsuit. It is meaningless.

The *Tulloss* court cited *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 60, n.21 (1974) for the correct legal conclusion in this mater stating that "in determining the admissibility of EEOC records at trial in a United States district court, we must "ever be mindful that Congress, in enacting Title VII, thought it was necessary to provide a judicial forum for the ultimate resolution of discriminatory employment claims." *Tulloss*, 776 F.2d at 152. In accord *see Silverman v. Bd. of Educ.*, 637 F.3d 729, 732 (7th Cir. 2011)

Additionally, the ALJ's decision following the EEOC hearing should be thrown out because it was rendered two and a half years after the hearings were held. (See Plaintiff's Ex C, pp. 2 and 11, hearing dates of December 14, 2016 and January 26, 2017, and EEOC Decision date of June 12, 2019, Defendant's Ex. 1) This huge delay in rendering a decision following the hearing dates makes the decision "untrustworthy," and is another sound basis for its rejection. *See Johnson v. Yellow Frieght Sup., Inc.*, 734 F.2d 1304, 1309 (8th Cir.) Cert denied, 469 U.S. 1041, 105 S.Ct. 525, 83 L.Ed.2d 413 (1984)

**C.     THE DEFENDANT ILLEGALLY TREATED PLAINTIFF AS IF SHE WERE STILL A PROBATIONARY EMPLOYEE WHEN IT REMOVED HER FROM THE CHIEF OF EMS POSITION**

It is fundamentally wrong as a legal matter to not include the Acting Chief of EMS period of time as part of Plaintiff's one-year probationary period because she served in the exact position without any disruption for over a year at the time she was removed.  Plaintiff was put into the position of Acting Chief of EMS in March of 2014 and was removed from the Chief of EMS on June 23, 2015. (Defendant's Statement of Facts, ¶¶ 7 and 61, respectively) And because there was no break in this period, and she continuously performed exactly the same duties, her one-year probationary period ended sometime in March of 2015, not when she was removed in June of 2015.

The regulation at 5 C.F.R § 315.906(b) and (e) covers this situation.  Pursuant to that regulation:

Crediting service toward completion of the probationary period.

(b)  Service on detail, temporary promotion, or reassignment to another supervisory or managerial position while serving probation is creditable toward completion of

probation.

And

(e) Temporary service in a supervisory or managerial position under temporary appointment, promotion. or reassignment prior to probation is creditable as determined by agency policy. Prior service under a detail may be credited only when a detail to a supervisory or managerial position is made permanent without a break in service.

The statutory citation in the Labor-Management and Employee Relations Act that contains this federal rule for employees like Plaintiff is at 5 U.S.C. § 7511.  That statute in relevant part states:

§7511. Definition; application

(a) For the purpose of this subchapter

(1) "employee" means -

(A) an individual in the competitive service -

(i) who is not serving a probationary or trial period under an initial appointment

Most of the case law disussing this rule comes up in Merit System Protection Board (MSPB) cases, because the MSPB does not have jurisdiction over probationary employees.

In the case of *Campbell v. United States Postal Serv.*, 88 M.S.P.R. 5461, 2001 MSPB LEXIS 545 (M.S.P.B. June 21, 2001) the Board found that the employee's time in a substantially similar position preceding her "probationary" period was creditable to her probationary period. Plaintiff Crain's case is better because her time was all in the exact same position without any interruption.  This statutory scheme is applicable to the United States Department of Veterans Affairs as can be seen in *Schibik v. Dept. of Veteran Affairs*, 98 M.S.P.R. 591 (May 26, 2005, Docket No. BN-315H-01-0180_M-1)

The Defendant relies completely on the erroneous finding in the EEOC Decision that Plaintiff's probationary period was properly calculated by Defendant. (Defendant Brief at page 30) There is no discussion by Defendant regarding the statutory or regulatory basis for such a finding. And, as discussed herein, such an analysis is wrong as a latter of law.  This is not a credibility finding which is apparently what the ALJ based her decision on.

The Defendant's illegal handling of Plaintiff's probationary period is part of a pattern of retaliation that Plaintiff has suffered since she exercised her rights to bring EEO charges against the Defendant,

**D.**     **PLAINTIFF WAS SUBJECTED TO A SEXUALLY
HOSTILE WORKING ENVIRONMENT THAT
DEFENDANT IS LIABLE FOR TAKING NO ACTION
TO STOP**

Contrary to Defendant's argument that Plaintiff did not even suffer a sexually hostile working environment, a review of the appropriate Supreme Court pronouncements in this area shows otherwise. In the case of *Oncale v. Sundowner Offshore Servs., Inc.* , 523 U.S. 75, 79-80 (1998) Judge Scalia's opinion explained that "harassing conduct need not be motivated by sexual desire."  And in explaining the severe or pervasive nature of such illegal hostile working environment the Court stated in *Harris v. Forklift Sys.*, 510 U.S. 17, 21-22 (1993) (quoting *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 64 (1986)) that the conduct "need only be 'severe or pervasive' as to alter the condition of [victim's] employment and create an abusive working environment."  *See also, Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (citing *Meritor*, 477 U.S. at 67).  The large subordinate probationary employee who touched Plaintiff's face as he tried to whisper in her ear, then later creepily waited outside the ladies' restroom to

24

talk to her late in the afternoon, certainly altered the conditions of Dr. Crain's employment at the RLR VAMC.

Plaintiff was instructed to lock her office door while she was at work; she was instructed to park in front of the Police station when she came to work; she was instructed to get an escort to walk her from her car into the building and from the building back out to her car; and she was instructed not to walk in the area of the hospital where this man was working without an escort. (Ex. A, Crain Dep. I, p. 50; Ex. B, Crain Dep. II, pp. 25, 27-28) And while her first complaints were made in December of 2014, and corroborated by her secretary Ms. Cunningham, Cathy Lee-Sellers maintained an "investigation" until March 30, 2015. (Ex. D, EEOC IF, pp. 00326 - 00339) And nothing was done to the employee. (Id.)

These changes in Plaintiff's working conditions are the type that should be found to constitute severe or pervasive changes in her working conditions, establishing a sexually hostile work environment.  And from her own personal observation Plaintiff has observed that management took quick action in other incidents of sexually harassing conduct at the RLR VAMC. (Ex. A, Crain Dep. I, p. 50) Defendant is simply wrong in stating that (a) Plaintiff has not suffered illegal sexual harassment, or (b) that she has not made out a case of disparate treatment based on Defendant's actions in other cases like hers.

Dr. Buchanan describes the situation where a subordinate male employee tries to establish his dominance over female authorities as *"contrapower harassment."*  (Ex. N, p. 4) And she describes this type of harassment as "commonly" occurring to Black women. (Id.)  Dr. Buchanan also finds that the "RLR VA's failure to take these allegations seriously and to allow the subordinate man to continue his employment without consequence reflects a disregard for Dr.

Crain's heightened risk and the consequences to her well-being." (Ex. N, pp. 4-5) And her

opinion also supports Dr. Crain's observation that when such conduct is perpetrated against

White women with very different treatment by management does reflect disparate treatment of

Plaintiff. (Ex. N, p. 5)

E.     **PLAINTIFF WAS DISCRIMINATED AGAINST BY
       DISPARATE PAY COMPARED TO WHITE CHIEFS OF
       SERVICE**

It is uncontroverted that in the Fall of 2014 management fully intended to make Plaintiff's

Chief of EMS position a GS-13 pay level, "like it used to be." (Ex. B, Crain Dep. II, pp. 55-56) It

is equally uncontroverted that the position had been downgraded on a national level in 2011, to a

GS-12 pay rate. Management knew that fact when they asked Elaine Scaife to rate the position in

the Summer of 2014.  And after Ms. Scaife's rating, management had all the information it

needed, from Scaife, to upgrade the position; and could have done so by adding laundry and/or

linen services to EMS. (Ex. E, Scaife Dep. pp. 48-51) Also uncontroverted, the HRO and the

Medical Director were both authorized to raise the pay level regardless of Scaife's rating. (Ex. E,

Scaife Dep. pp. 23, 53)

And while management did nothing to raise the Chief EMS pay to a GS-13 level, White

male and female chiefs of service were being raised in pay to the GS-13 or even GS-14 pay

levels, in: Logistics (against a national standard); in Police Services; in SCOPE, a new service

with duties and employees added to it to raise it to a high level; in BioMed Service; in three

positions under Scaife's boss, Gavin Earp. (Ex. E, Scaife Dep. pp. 57-62, 64) And there were

other White chiefs being promoted to GS-13 or GS-14 levels in: Food and Nutrition Service; and

in Systems Redesign. (Ex. B, Crain Dep. II, p. 58. ex. 60) Dr. Buchanan finds these disparities

represent "inequitable practices and their continuing the disparities in pay for years after it was brought to their attention demonstrates an ongoing disregard for maintaining an equitable work environment and a willful perpetuation of discriminatory practices." (Ex. N, p. 4)

### F.   BEING GIVEN OUT OF CHAIN-OF-COMMAND WORK INSTRUCTIONS UNDERMINES HER AUTHORITY

Defendant attempts to downplay Business Manager Tara Casey giving instructions to Dr. Crain by trying to frame it as simply relaying an instruction Plaintiff admits would be proper if she got it from Cathy Lee-Sellers (Defendant Brief at 28). But that characterization completely misses how this undermines Dr. Crain's authority because she DID NOT GET IT from Cathy Lee-Sellers, it came from an inferior supervisor, Casey. That type of out-of-command instruction does disrespect Dr. Crain's position at the hospital, especially among military Veterans like Dr. Crain, who respect the proper chain-of-command. And, contrary to Defendant's position, the undermining of authority can constitute discrimination. *See Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1362 (Fed. Cir. 2012) (undermining authority of whistleblower plaintiff can be considered some evidence of retaliatory intent).

### G.   PLAINTIFF HAS BEEN SUBJECTED TO A CONTINUING SERIES OF RETALIATION SINCE COMPLAINING OF DISCRIMINATION

Title VII forbids employers from retaliating against employees for engaging in statutorily protected activities by opposing an unlawful employment practice or by participating in the investigation. *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 884-885 (7th Cir. 2018). To prove retaliation by what has been called the "direct" method, the *Swyear* court stated:

> A plaintiff opting for the "direct" method must present evidence that (1) she engaged in a protected activity, (2) she suffered an adverse action, and (3) a causal

connection exists between the two. *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003)

911 F. 3d at 885.  To prevail, by this method, Plaintiff must show that the reasons proffered by the employer are "pretextual." (Id.)[3]

In the case of *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016) the Seventh Circuit stated the following regarding the type and quantity of evidence needed to prove an employment discrimination case:

> That legal standard ... is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action. Evidence must be considered as a whole ... Evidence is evidence.  Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled "direct" or "indirect."

834 F.3d at 765.  While *Ortiz*, *supra,* overruled any previous decision that had stated any kind of a "mosaic test," taken from the case of *Troupe v. May Department Stores Co.*, 20 F.3d 734 (7th Cir. 1994) as a legal standard for examining differing types of employment discrimination evidence, it did not eviscerate Judge Posner's excellent discussion in that case of some of the different evidence that an employment discrimination plaintiff could utilize to prove her case. That evidence includes:

> suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. ...evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment. ...evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the

---

[3] Retaliation claims by employees against the federal government are a "well settled" matter. *Bd. of County Comm'rs v. United States EEOC*, 405 F.3d 840, 845 (10th Cir. 2005)

difference in treatment is unworthy of belief, a mere pretext for discrimination.

*Troupe v. May Dept. Stores*, 20 F.3d at 736.  Plaintiff Crain proffers evidence in response to

Defendant's motion for summary judgment that would allow a reasonable fact-finder to find that

she has been subject to employment discrimination based on race, gender and retaliation.

### 1.      The Reasons For Her Removal As Chief Are Pretextual

The first matter cited in her removal memorandum of June 23, 2015 was a written

warning that Cathy Lee-Sellers issued to everyone in EMS on December 8, 2014, alleging

"profanity and/or abusive language." (Ex. A, Crain Dep. I, ex. 22) Plaintiff disputes any incident

that would cause this allegation to apply to her, and further in the removal memorandum,

plaintiff disputes any profanity in talking to Tara Casey about the Atterbury work issues, or being

abusive in a later discussion about the same. (Ex. A, Crain Dep. I, pp. 78-84)

Most of the witnesses in this case report Dr. Crain's language at the RLR VAMC as

"professional." (Nicole Golder, union president; EMS supervisors Williams and Franklin; fiscal

co-worker Julynn Walker) The majority of testimony in this case was that RLR VAMC

executives and service chiefs and supervisors routinely cuss in meetings, including dropping the

F-bomb, and that it is not uncommon to hear cussing there. (Ex. I, Brown Dep., pp. 19-21, 22,

24); (Ex. G, Sims Dep. pp. 26-29); (Ex. J, Taylor Dep. pp. 26-27); and (Ex. K, Caruthers Dep.

pp. 21-22) Defendant's claims that Dr. Crain is "uncouth" are simply not supported, and are

evidence of pretext.

Plaintiff was removed from Chief of EMS for the allegation: "you made a decision to

suspend use of Wexcide Cleaning product."  (Ex. A, Crain Dep. I, ex. 22) This is an outrageous

lie, and easily shown to be a pretextual reason stated in the removal memorandum.  Plaintiff's

29

evidence that this decision was approved by Safety and Infection Control with input from Nursing is overwhelming.  See Section C, Statement of Material in Dispute. above. This is strong evidence of pretext.

Included in her removal memorandum was an allegation that she completely abandoned and mismanaged the uniform rollout. (Ex. A, Crain Dep. I, ex. 22) Plaintiff's evidence likewise allows a conclusion to be drawn that this allegation is also pretextual. (Ex. F, Claybrook Dep. pp. 27-28) The project was a joint effort with a lot of bumps in the road, but not with any evidence that Dr. Crain abandoned the project or mismanaged its implementation. Her EMS supervisor Robert Franklin testified that the only thing Dr. Crain did wrong was to actually work "handing out uniforms." (Franklin EEOC testimony: Ex. C, pp. 496-498) Her EMS supervisor Reginald Williams testified that everyone ended up getting uniforms and Dr. Crain got no credit for it. (Williams EEOC testimony, Ex. C, pp. 469-470)

And the last allegation supporting the removal memorandum was that she had engaged in pre-selection of Robert Franklin in filling her position of Assistant Chief of EMS. (Ex. A, Crain Dep. I, ex. 22) Plaintiff's evidence puts this allegation in the light of pretext: given that the questions for interviewees were created by herself and Deb Thayer (Ex. B, Crain Dep. II, p. 77, ex. 64); she asked Deb Thayer to be the panel chair for the interviews so as not to seem unfair to the others because Robert Franklin was interviewing for the position (Ex. B, Crain Dep. II, pp. 77, 87); and she talked to Acting Assistant Medical Director Clyde Angel after the first round of interviews and informed him she and Deb Thayer had thought there were inconsistencies with the first round of ratings that needed ot be considered. (Ex. B, Crain Dep. II, p. 81) Next thing she knows, she is removed completely from having any input into selecting her assistant chief. (Ex.

B, Crain Dep. II, p. 83, ex. 67) It is beyond the pale to claim Dr. Crain acted inappropriate in any way in this selection; especially given that Mr. Angel and Fiscal Chief Meyers both testified that they are fully involved in selecting any person that comes into their area, even as chief of service.

Defendant's attempt to characterize Dr. Crain as an "inept" manager in its briefing is belied by Dr. Crain's accomplishments and by the glowing praise heaped upon her by her EMS supervisors, Williams and Franklin, by the assistants she had in EMS like Shannon Claybrook, Ryan Kuster and David Walker, by the union president Nicole Golder, and by her secretary Delisa Cunningham.  Defendant's mis-characterization of Dr. Crain's work as Chief of EMS is particularly disgusting, given the amount of money she saved the Agency and given the improved efficiencies in performing the service's main responsibility in cleaning the hospital.

2.     **The Series of Retaliatory Events Plaintiff Has Been Subjected To Since Being Removed As Chief Of EMS Are Blatantly Retaliatory**

The retaliatory events post-removal from Chief of EMS are: assigned to Fiscal Service where she has no education or work experience; not being given a position description or standards for how she is supposed to work in Fiscal; being told by Fiscal Chief Joshua Meyers that he was instructed not to give her a PD or standards for her work there; never being placed in Fiscal's organization chart, even when it was redone because of the VISN re-alignment; and going on vacation and having her personal items, including medical records, at Ft. Harrison rifled through, lost and broken.  There are no good reasons, and certainly no non-pretextual reasons, for these events.

Then when Dr. Crain attempts to upgrade her pay level to a GS-13 by posting for Assistant Chief of Fiscal, she is denied even an interview; even though she has a Doctorate

Degree in Health Administration that contained some accounting/financial study, and she had been working in Fiscal at that point for two (2) years. (Ex. A, Crain Dep. I, p. 219) And when Dr. Crain does get a job interview for a GS-13 position, Chief of Patient Care Services, her chief tormentor, Cathy Lee-Sellers, is on the interview panel.  Dr. Crain knew she was out of the running when she saw Ms. Lee-Sellers. (Ex. A, Crain Dep. I, pp. 227-229) Plaintiff also believes that the fact that her RLR VAMC history falsely states that she failed a previous supervisory "probationary" period is fatal to getting such a job assignment there. (Ex. A, Crain Dep. I, pp. 233-234) And apparently going on continuously since she was removed from Chief of EMS, managers have spread the rumor that she was removed as Chief of EMS for sleeping with suborindate EMS employees. (Andy Brown testimony: Ex. I, Dep. pp. 15-17) (heard statement "sleeping with employee in her service" and heard rumor in June of 2020); (Patricia Caruthers' testimony: Ex. K, Dep. pp. 22-23) (she heard it from her staff back in 2016 when Dr. Crain came to Fiscal).

All of the above list of retaliatory incidents could be found to be retaliatory by a reasonable fact-finder, given the totality of the evidence put forward by Dr. Crain.  Dr. Buchanan finds these incidents to constitute discriminatory retaliation. (Ex. N, p. 5)

IV.    **CONCLUSION**

For all of the foregoing reasons, Defendant's motion for summary judgment must be denied in its entirety.

32

Respectfully submitted,

ALLMAN LAW LLC


 /s/ Joseph E. Allman
Joseph E. Allman #17214-28
Attorney for Plaintiff
Toya R. Crain, D.H.A.

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 13th day of November, 2020, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's ECF System.

J. Taylor Kirklin
Rachana N. Fischer
U.S. Attorney's Office
Southern District of Indiana
10 West Market Street
Suite 2100
Indianapolis, IN  46204
Taylor.Kirklin@usdoj.gov


    /s/Joseph E. Allman
Joseph E. Allman #17214-28


ALLMAN LAW LLC
One Indiana Square
211 North Pennsylvania Street
Suite 1330
Indianapolis, IN 46204
Tel/Fax: 317.608.1136
Email: jallman@allmanlegal.com